**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| CHAO LIN FANG, | : | **Hon. Susan D. Wigenton** |
| | : | |
| Petitioner, | : | Civil No. 10-5031 (SDW) |
| | : | |
| v. | : | |
| | : | |
| GREG BARTKOWSKI, et al., | : | **O P I N I O N** |
| | : | |
| Respondents. | : | |

**APPEARANCES:**

CHAO LIN FENG, #763602B
New Jersey State Prison
P.O. Box 861
Trenton, New Jersey  08625
Petitioner pro se

VERED ADONI, Assistant Prosecutor
BERGEN COUNTY PROSECUTOR
Bergen County Justice Center
Hackensack, New Jersey  07601
Attorneys for Respondents

**WIGENTON, District Judge**:

Chao Lin Feng filed a Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254 challenging a judgment of conviction in the Superior Court of New Jersey, Bergen County, filed on February 26, 1996, and amended on October 4, 2000, after a jury found him guilty of four counts of purposeful and knowing murder, two counts of attempted murder, five counts of felony murder, two counts of kidnapping, one count of burglary, one count of attempted arson, and various weapons offenses.  Respondents filed an Answer, arguing that certain grounds raised in the Petition were procedurally defaulted, and that the remaining grounds did not warrant habeas

relief.  Feng filed a Reply, arguing that there was no procedural default; if any claims were procedurally defaulted, he has shown cause and prejudice; and he is entitled to relief on the merits.  For the reasons expressed below, this Court will dismiss the Petition on the merits with prejudice and decline to issue a certificate of appealability.[1]

## I.  BACKGROUND

On December 15, 1995, a jury found Chao Lin Feng (and his co-defendants) guilty of four counts of purposeful and knowing murder, two counts of attempted murder, five counts of felony murder, two counts of kidnapping, one count of burglary, one count of attempted arson, and various weapons offenses.  By judgment of conviction filed February 26, 1996, the Law Division sentenced Feng to 140 years in prison without parole eligibility.  The pertinent facts, as recounted by the Appellate Division of the Superior Court of New Jersey on direct appeal, are as follows:

> The evidence presented by the State demonstrated that the shootings and stabbings involved arose from an intra-gang rivalry in the Chinese gang known as Fuk Ching.  The State's evidence overwhelmingly established that defendants planned the murders in retaliation for the earlier murders of two friends of one of the defendants, Xin Dan Lin [footnote:  It seems that the earlier murders were committed at the direction of the leader of the gang, Ah Kay, in response to dissatisfaction expressed by Xin Dan Lin, his two murdered friends and others over the leadership of Ah Kay], and in an effort to obtain leadership of the gang and its lucrative participation in the illegal smuggling of Chinese aliens.  That evidence included testimony from four Fuk Ching gang members, one of whom was a victim and another who was present at the scene.  The testimony of these

---

[1] To the extent that Petitioner's claims are procedurally defaulted, this Court will deny them on the merits pursuant to 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State").  See Bronshtein v. Horn, 404 F. 3d 700, 728 (3d Cir. 2005) ("We would permit Bronshtein to attempt on remand to establish a reason to excuse his procedural default, but we find it unnecessary to do so because it is apparent that the claims in question lack merit.  Under 28 U.S.C. § 2254(b)(2), we may reject claims on the merits even though they were not properly exhausted, and we take that approach here").

witnesses was, to an extent, effectively impeached by defense counsel. But the State's case also included other inculpatory evidence obtained from the crime scene, the vehicles used and a Brooklyn apartment where the crimes were planned. The evidence included impartial witness accounts and physical evidence directly connecting defendants to the crimes.

As to those crimes, here is what the evidence shows. On May 24, 1993, sometime prior to 7:00 p.m., defendants arrived at 1326 Somerset Road in Teaneck and gained entrance. At the time, 1326 Somerset Road had been rented for the gang's leader, Ah Kay, and was used as a "safe house" for the Chinese aliens the gang had smuggled into the United States. Ah Kay's younger brother, Ah Wong, lived in the house and was responsible for handling the arrangements there. At the time of the murder, there were four gang members living in the house and one of the smuggled aliens. It was these five individuals who became defendants' victims. The alien, Lin Ling Chang, was the only survivor. He identified Xin Dan Lin, Yun Lin, Chao Lin Feng and Cho Lee Lin as among those who committed the murders and who attempted to murder him.

According to Lin Ling Chang, earlier in the day, three of the four resident gang members had left the house, leaving one gang member, Liang Qun Guo (also a brother of Ah Kay), with Lin Ling Chang. While Lin Ling Chang was in the kitchen, he heard the doorbell ring. Liang Qun Guo went to the door and moments later a number of people entered the kitchen and a gun was pointed at Lin Ling Chang's head. Liang Qun Guo started to fight with the intruders. There were gunshots. Both Lin Ling Chang and Liang Qun Guo, who had been shot, were dragged to the basement, tied and duct taped.

Meanwhile, between 6:00 p.m. and 7:00 p.m., Al Wong, with gang members Yu Ping Zhang, Guang Sheng Li and Ming Cheng, arrived back at the house. No one answered the front door. They could not gain access through the back door. Finally, while Ah Wong, Guang Sheng Li and Ming Cheng waited at the front door, Yu Ping Zhang gained access through a back window and went to open the front door. As he was doing so, he was shot and, as the three others pushed through the front door, they were met by several people, one of whom was Zin Dan Lin, coming from the second floor with guns.

Ming Cheng escaped. Ah Wong, Guang Sheng Li and Yu Ping Zhang, along with Liang Quin Guo who had been removed to and tied in the basement, were not so lucky. Yu Ping Zhang was found by the front door. He died of multiple stab wounds and a gunshot wound to his head. Guang Sheng Li was found in the front hallway near the basement stairs. He died of multiple gunshot wounds and a stab wound. Liang Qun Guo was found in the basement. He died of multiple gunshot wounds. Ah Wong was found outside. He died of multiple gunshot wounds. Lin Ling Chang, the lone survivor, was found in the basement with a gunshot wound

to his head.  There were numerous guns, knives and bullets, among other items, found by the police throughout the house.  It was determined that the guns in the house were the weapons used to shoot the victims found in the house.

A number of residents in the area heard the gun shots and saw much of the killing of Ah Wong, as well as the defendants' get-away.  As a result of their eye-witness accounts, the two get-away cars were identified and, ultimately, found, as was the nine-millimeter weapon that was used to shoot Al Wong and then thrown under a parked car.

Shortly after the shootings and stabbings, one of the get-away vehicles, a blue van, was spotted by the police as it approached a toll plaza near the George Washington bridge.  The vehicle was stopped and the five occupants, defendants Jeffrey Zhu, Xin Dan Lin, Yun Lin, Chao Lin Feng and Cho Lee Lin, were arrested and searched.  A knife sheath was found on Zhu.  A bullet that matched bullets in an assault weapon found in the front foyer of the house was retrieved from one of Xin Dan Lin's pockets.  Numerous inculpatory items were seized from the defendants and the vehicle, including blood-stained clothing.

Blood stain analysis performed on the clothing revealed human blood found on Xin Dan Lin's blue jeans and shoes, on Chao Lin Feng's gold gacket, tee-shirt, black jeans and both sneakers, on Cho Lee Lin's tan jacket, and on the jacket found in the van.  DNA analysis revealed that the blood from Cho Lee Lin's tan jacket matched that of Liang Qun Guo (the victim found murdered in the basement), that the blood found on Chao Lin Feng's tee-shirt matched that of Yu Ping Zhang (one of the victims found murdered in the hallway), and that the blood found on Xin Dan Lin's blue jeans also matched that of Yu Ping Zhang.  In addition, DNA analysis of blood found on a jacket in the van matched the blood of victim Yu Ping Zhang.

None of the physical evidence at the scene linked Simon Lau to the crimes.  However, when the second vehicle was later found abandoned on the lower east side of Manhattan, it was discovered that it was registered to Simon Lau's sister.  Moreover, Ming Cheng identified him as a participant at the scene and gang members Allan Tam and Henry Tu provided testimony that he was actively involved in the planning of the killings.

Finally, a search of Chao Lin Feng's apartment at 5413 5th Ave., Brooklyn, revealed a sketch of the layout at 1326 Somerset, which had Tam's fingerprints on it; green knife sheaths; duct tape; a match book with the name "Simon" and a telephone number inscribed on it; a plastic container similar to the containers found at 1326 Somerset that had gasoline in them; and fingerprints of both Chao Lin Feng and Xin Dan Lin.

State v. Feng, Docket No. A-5065-95 T4 slip op. at 6-10 (N.J. Super. Ct., App. Div., Apr. 5, 1999).  The Appellate Division affirmed the conviction, but remanded for resentencing because some of the convictions should have merged.  See State v. Feng, Docket No. A-5065-95 T4 slip op. at 33-35.

The New Jersey Supreme Court granted certification limited to the question of whether the elevated security deprived defendants of their right to a fair trial by creating an unacceptable atmosphere suggestive of guilt.  See State v. Zhu, 165 N.J. 544, 547 (2000).  On October 4, 2000, the Law Division entered an amended judgment of conviction which again imposed a 140-year term without parole eligibility.  [Dkt. 14-9 at 94-95.]  In a published opinion filed October 23, 2000, the New Jersey Supreme Court affirmed, finding that the increased security measures did not "pose an unacceptable risk of unfairness" under Holbrook v. Flynn, 475 U.S. 560 (1986), despite the absence of a cautionary instruction during trial or before deliberations.  See Zhu, 165 N.J. at 529.

In November 2000, Feng filed a petition for post-conviction relief in the Law Division. By order filed December 9, 2005, Superior Court Judge William C. Meehan (the sentencing judge) denied relief for the reasons set forth on the record on November 21, 2005.  [Dkt. 14-8 at 152.]  Feng appealed, and on April 6, 2010, the Appellate Division affirmed.  See State v. Lin, 2010 WL 1330272 (N.J. Super. Ct., App. Div., Apr. 6, 2010), certif. denied, 203 N.J. 93 (2010) (table).  On June 30, 2010, the New Jersey Supreme Court denied certification.  Id.

Feng executed the § 2254 Petition on September 23, 2010.  The Clerk received it on September 29, 2010.  In response to this Court's Order issued pursuant to Mason v. Meyers, 208

F.3d 414 (3d Cir. 2000), on January 10, 2011, Feng asked this Court to rule on his Petition as is.

[Dkt. 4.]  The Petition, raises seven grounds:

> Ground One:  PETITIONER'S RIGHTS TO DUE PROCESS AND AN IMPARTIAL JURY AS GUARANTEED BY THE UNITED STATES CONSTITUTION, AMENDMENTS SIXTH AND FOURTEENTH WERE VIOLATED DUE TO TRIAL COURT'S INADEQUATE VOIR DIRE AND DEPRIVATION OF PETITIONER'S STATUTORY RIGHTS TO INTELLIGENTLY CHALLENGE JURORS FOR CAUSE AND EXERCISE PEREMPTORY CHALLENGES.
>
> Ground Two:  THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY DENYING PETITIONER'S MOTION TO VOIR DIRE THE JURY REGARDING PUBLISHED PREJUDICIAL INFORMATION, THEREBY VIOLATING PETITIONER'S RIGHT TO BE TRIED BY A FAIR AND IMPARTIAL JURY AS GUARANTEE[D] BY SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.
>
> Ground Three:  THE TRIAL COURT ERRED BY ALLOWING THE PROCEEDINGS TO BE CONDUCTED IN SUCH A MANNER AS TO DEPRIVE DEFENDANT OF HIS RIGHT TO A FAIR TRIAL WHEN THE TRIAL COURT CONSISTENTLY PERMITTED SHERIFF OFFICERS TO ACT IN SUCH A MANNER AS TO GIVE THE JURY THE PERCEPTION THAT THE DEFENDANT WAS GUILTY.
>
> Ground Four:  THE TRIAL COURT'S FAILURE TO  DISMISS THE BURGLARY COUNT OF THE INDICTMENT VIOLATED PETITIONER'S RIGHT TO DUE PROCESS UNDER THE UNITED STATES CONSTITUTION.
>
> Ground Five:  THE STATE'S SUPPRESSION OF FAVORABLE EVIDENCE TO DEFENDANT AND KNOWING USE OF PERJURED TESTIMONY IS A VIOLATION OF THE RULES OF DISCOVERY AND PROSECUTORIAL MISCONDUCT, THEREBY VIOLATING DEFENDANT'S RIGHT TO A FAIR TRIAL AND DUE PROCESS RIGHTS SECURED BY THE UNITED STATES CONSTITUTION.

> Ground Six:  PETITIONER WAS DEPRIVED OF EFFECTIVE
> ASSISTANCE OF TRIAL COUNSEL WHEN COUNSEL
> FAILED TO EXERCISE PETITIONER'S SIX REMAINING
> PEREMPTORY CHALLENGES TO STRIKE JURORS DONNA
> RAKOWSKI, ELAINE O'BRIAN AND ALMA REAVIS WHICH
> RESULTED IN BIASED JURORS ON PETITIONER'S JURY,
> THEREBY DEPRIVING PETITIONER THE RIGHT
> EFFECTIVE ASSISTANCE OF COUNSEL, DUE PROCESS OF
> LAW, AND A FAIR AND IMPARTIAL JURY UNDER THE
> U.S. CONSTITUTION AMENDS. V, VI, & XIV.
>
> Ground Seven:  THE DEFENDANT WAS DENIED HIS RIGHT
> TO THE EFFECTIVE ASSISTANCE OF COUNSEL
> GUARANTEED BY THE SIXTH AMENDMENT OF THE
> UNITED STATES CONSTITUTION.

[Dkt. 1 at 14, 25, 29, 35, 39, 44, 48.]

Respondents filed an Answer and a copy of the state court record, arguing that certain

grounds were procedurally defaulted and the remaining grounds should be dismissed on the

merits.  Petitioner filed a Reply, arguing that he did not procedurally default his claims, he has

shown cause and prejudice, and he is entitled to relief on the merits of his claims.

## II.  STANDARD OF REVIEW

Section 2254(a) of Title 28 of the United States Code gives the court jurisdiction to

entertain a habeas petition as follows:

> [A] district court shall entertain an application for a writ of habeas
> corpus in behalf of a person in custody pursuant to the judgment of
> a State court only on the ground that he is in custody in violation of
> the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a).

"As amended by AEDPA, 28 U.S.C. § 2254 sets several limits on the power of a federal

court to grant an application for a writ of habeas corpus on behalf of a state prisoner."  Cullen v.

Pinholster, 131 S. Ct. 1388, 1398 (2011).  Section 2254(a) permits a court to entertain only

claims alleging that a person is in state custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The AEDPA further limits a federal court's authority to grant habeas relief when a state court has adjudicated petitioner's federal claim on the merits. See 28 U.S.C. § 2254(d). If a claim has been adjudicated on the merits in state court proceedings, § 2254(d) limits habeas relief as follows:

> (d) An application for a writ of habeas corpus . . . shall not be granted with respect to any claim that was adjudicated on the merits in State Court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A court begins the analysis under § 2254(d)(1) by determining the relevant law clearly established by the Supreme Court. See Yarborough v. Alvarado, 541 U.S. 652, 660 (2004). Clearly established law "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. A court must look for "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Lockyer v. Andrade, 538 U.S. 63, 71, 72 (2003).

A decision is "contrary to" a Supreme Court holding within 28 U.S.C. § 2254(d)(1), if the state court "contradicts the governing law set forth in [the Supreme Court's] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of th[e Supreme] Court and nevertheless arrives at a [different] result." Williams v. Taylor, 529 U.S. 362, 405-06

8

(2000).  Under the "'unreasonable application' clause of § 2254(d)(1), a federal habeas court may

grant the writ if the state court identifies the correct governing legal principle from th[e Supreme]

Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."

Williams, 529 U.S. at 413.  However, under § 2254(d)(1), "an *unreasonable* application of

federal law is different from an *incorrect* application of federal law."  Harrington, 131 S. Ct. at

785 (quoting Williams at 410).[2]  As the Supreme Court explained,

> A state court's determination that a claim lacks merit precludes
> federal habeas relief so long as fairminded jurists could disagree on
> the correctness of the state court's decision . . . .  Evaluating
> whether a rule application was unreasonable requires considering
> the rule's specificity.  The more general the rule, the more leeway
> courts have in reaching outcomes in case-by-case determinations.
> It is not an unreasonable application of clearly established Federal
> law for a state court to decline to apply a specific legal rule that has
> not been squarely established by [the Supreme] Court.

Harrington, 131 S. Ct. at 786 (citations and internal quotation marks omitted).

"This is a difficult to meet, and highly deferential standard for evaluating state-court

rulings, which demands that state-court decisions be given the benefit of the doubt."  Cullen, 131

S. Ct. at 1398 (citations and internal quotation marks omitted).  The petitioner carries the burden

of proof, and review under § 2254(d)(1) is limited to the record that was before the state court

that adjudicated the claim on the merits.  Id.

---

[2] See also Wright v. Van Patten, 128 S. Ct. 743, 747 (2008) ("Because our cases give no
clear answer to the question presented, let alone one in [petitioner's] favor, it cannot be said that
the state court unreasonabl[y] appli[ed] clearly established Federal law") (citation and internal
quotation marks omitted).

## III.  DISCUSSION

A.  Sixth Amendment - Inadequate Voir Dire Regarding Publicity (Ground Two)

In Ground Two, Feng argues that the trial court's denial of defendants' request to *voir dire* jurors regarding a newspaper article published in the Bergen Record on December 5, 1995, which revealed the substance of his statements to police and was not presented to the jury as evidence, violated his Sixth and Fourteenth Amendment rights.  Feng presented Ground Two on direct appeal to the Appellate Division and New Jersey Supreme Court, but the New Jersey Supreme Court denied certification on this issue.

The facts regarding Ground Two were recited by the Appellate Division on direct:

Because there had been pretrial publicity of the case, the trial judge incorporated in his jury selection questionnaire a number of questions that probed the prospective jurors' awareness of and/or exposure to such publicity and, if so, whether the publicity had led to their having formed an opinion about the case. He also gave publicity-related warnings during the selection process and periodically throughout the trial.

During the selection process, an article appeared in the local newspaper regarding a hunger strike defendants engaged in to protest alleged abuses against them by the Sheriff's office.  The trial judge refused a request to voir dire the prospective jurors about the article but did, as it had previously, caution the jurors not to listen to any media accounts on TV or radio and not to read any newspaper articles regarding the case.  He specifically warned the panel about the article in that day's paper and reminded them that the case had to be decided based on the evidence presented in the courtroom, not on what was printed in a newspaper.

On September 26, 1995, just prior to opening arguments, defense counsel brought to the trial judge's attention an article in that Sunday's Star Ledger which included photos of all the defendants and a headline which read, "Who Pulled the Trigger?" The first sentence of the article read, "[i]t was one of the bloodiest murders the state has ever seen" . . . .  The trial judge refused counsel's request to voir dire the jury regarding the article, observing that the Star Ledger was not as well read in Bergen County as the Record and the Herald News.  But he again cautioned the jury not to read any newspaper articles or listen to any TV or radio broadcasts about the case.  The jury was also told that newspaper and media accounts were

10

not evidence, were often based on second- or third-hand information, were not always accurate, and were not subject to cross-examination by the attorneys . . . .

The issue of prejudicial publicity did not arise again until the middle of the trial. On October 19, 1995, Zin Dan Lin's counsel was arrested for allegedly assaulting a sheriff's officer as he was leaving the courtroom. The incident apparently occurred out of the presence of the jury. But a few days later on October 22, 1995, counsel requested a jury voir dire, noting that the news regarding the arrest was "all over the courthouse" and everyone was talking about it. The trial judge agreed to do so. Each juror was separately questioned.

*                    *                    *

[The trial judge ultimately] denied defendants' request for a mistrial but granted the alternative request to dismiss [one] juror. During argument on the application, the prosecutor asserted, "[y]ou're just letting them win. We started with fifteen when we should have had sixteen. We lost one. We're going to have one alternative now?"

We cannot be sure, but it may have been this comment which prompted the trial judge to state the next day, in the face of yet more publicity, "[t]here are not going to be any more jury voir dires." The additional publicity was as follows. In that morning's Record the prosecutor was quoted as alleging that defense counsel were maneuvering for a mistrial because they knew "they don't have a case." [Two other articles allegedly quoting the prosecutor were brought to the judge's attention.]

This prompted the judge to enter a gag order against all attorneys and all members of the Sheriff's Department. But he declined to voir dire the jurors on the three news articles . . .

*                    *                    *

In essence, the trial judge, though troubled by the then flood of publicity, viewed the articles, for the most part, as extraneous to the case and not containing any evidential or prejudicial material. In light of his prior admonitions to the jury concerning publicity about the case, the judge found no need to go through another round of voir dires. We think his reasoning for not doing so is sound and find no basis for interfering in the exercise of his discretion.

More troublesome, however, is the judge's handling of an article that appeared in the Record on December 5, 1995. When the jury was excused on December 4, 1995, it was not cautioned about news articles, although it had been so cautioned periodically throughout the trial. The article that appeared the next day in the

11

Record was placed on pages one and five of the local section and bore the rather innocuous headline "Defense arguments begin in gang case." On page one, the article stated that two of the defendants had not presented a defense but that codefendant Zhu had called five witnesses in an attempt to show that he was "an unwitting bystander" who had left Boston in May to see a concert. The article continued on the fifth page . . . . It then set forth in one paragraph the prosecutor's theory that the killings resulted from a power struggle within the ranks of the Fuk Ching gang, and followed with information that the defense would wrap up their case quickly . . . . [T]he article also reported that the trial judge had determined, following a mid-trial voluntariness hearing, that the defendants' statements could be used at trial should they testify because the allegations that the police had beaten and coerced them were false. Specifically, the article stated:

> None of the remaining three defendants is expected to take the stand in the wake of Judge William C. Meehan's decision that the statements the men gave to police could be used against them. Last week, defense attorneys had argued that the defendants were beaten and coerced . . . . But Monday morning, Meehan decided the accusations were false and the statements were admissible.

> According to summaries of those statements, which likely will never be heard by the jury, four of the defendants admitted to being at the scene, but none said he killed anyone. Dan Xin Lin said he pointed his Uzi at one of the injured victims, but that the gun failed. Chao Lin Feng said he was offered $100,000 to participate in the revenge killings, while Jeffrey Zhu admitted he drove four of the defendants to Teaneck and had been told to go upstairs in the house to serve as a lookout.

> Meanwhile, one defendant, Cho Lee Lin, said he had been held hostage in the house for a month and, when he heard the shots, crawled out a window and hid in the van. Another, Yun Lin, said he rode in the van, but that it never stopped and he never saw any weapons or blood.

> The sixth defendant, Simon Lau, who was arrested in Florida this year, never made a statement to police. A seventh suspect, Shing Chung, remains at large.

The recitation at the end of the article of defendants' police statements casts this article in a different light from all of the others. Though the statements could have become evidential, albeit with limiting instructions, they did not since defendants chose not to testify. The December 5, 1995 article, thus, contained evidence that was never presented to the jury. The potential for prejudicial jury taint, then, was for more serious than with the prior articles . . . . [W]hen the jury was brought into the courtroom, the judge instructed:

12

> Before we start, it was brought to my attention yesterday I forgot to remind
> you please do not read any articles relating to this case.  Articles are not
> always accurate and correct and are not evidence in the case.  Please don't
> read any articles or discuss them among yourselves or with anyone else.

State v. Feng, Docket No. A-5065-95T4 slip op. at 15-25.

The Sixth Amendment of the United States Constitution provides that "the accused shall enjoy the right to . . . trial by an impartial jury."  U.S. Const. amend. VI.  "The theory of our [trial] system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." Skilling v. United States, 130 S.Ct. 2896, 2913 (2010).  Supreme Court "decisions, however, cannot be made to stand for the proposition that juror exposure to . . . news accounts of the crime . . . alone presumptively deprives the defendant of due process.  Prominence does not necessarily produce prejudice, and juror *impartiality*, we have reiterated, does not require *ignorance*."  Id. at 2914-15 (citation and internal quotation marks omitted) (emphasis in original).  See also Irvin v. Dowd, 366 U.S. 717, 722 (1961) (Jurors are not required to be "totally ignorant of the facts and issues involved"; "scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case").  Moreover, "[t]he jury's ability to discern a failure of proof of guilt of some of the alleged crimes indicates a fair minded consideration of the issues and reinforces our belief and conclusion that the media coverage did not lead to the deprivation of [the] right to an impartial trial."  Skilling, 130 S.Ct. at 2916 (quoting United States v. Arzola-Amaya, 867 F.2d 1504, 1514 (5th Cir. 1989)).

The Supreme Court noted that its "decisions have rightly set a high bar for allegations of juror prejudice due to pretrial publicity.  News coverage of civil and criminal trials of public interest conveys to society at large how our justice system operates.  And it is a premise of that

13

system that jurors will set aside their preconceptions when they enter the courtroom and decide cases based on the evidence presented." Skilling, 130 S.Ct. at 2925 n.34. "Jurors . . . need not enter the box with empty heads in order to determine the facts impartially.  'It is sufficient if the juror[s] can lay aside [their] impression[s] or opinion[s] and render a verdict based on the evidence presented in court.'" Skilling, 130 S.Ct. at 2925 (quoting Irvin v. Dowd, 366 U.S. 717, 723 (1961)).

When pretrial publicity is at issue, "primary reliance on the judgment of the trial court makes [especially] good sense" because the judge "sits in the locale where the publicity is said to have had its effect" and may base her evaluation on her "own perception of the depth and extent of news stories that might influence a juror." Mu'Min v. Virginia, 500 U.S. 415, 427 (1991). "Reviewing courts are properly resistant to second-guessing the trial judge's estimation of a juror's impartiality, for that judge's appraisal is ordinarily influenced by a host of factors impossible to capture fully in the record - among them, the prospective juror's inflection, sincerity, demeanor, candor, body language, and apprehension of duty.  In contrast to the cold transcript received by the appellate court, the in-the-moment voir dire affords the trial court a more intimate and immediate basis for assessing a venire member's fitness for jury service." Skilling, 130 S.Ct. at 2918.  Lines of inquiry that "might be helpful in assessing whether a juror is impartial" are not hard to conceive.  Mu'Min v. Virginia, 500 U.S. 415, 425 (1991).  "To be constitutionally compelled, however, it is not enough that such questions might be helpful. Rather, the trial court's failure to ask these questions must render the defendant's trial fundamentally unfair."  Id. at 425-426.  Fundamental unfairness arises if voir dire is not "adequate . . . to identify unqualified jurors."  Morgan, 504 U.S. at 729.

14

In Mu'Min v. Virginia 500 U.S. 415, the Supreme Court held that the Constitution does not require the state trial court to put questions about the content of publicity to potential jurors.

Id. at 425-26.  The Supreme Court concluded:

> The *voir dire* examination conducted by the trial court in this case was by no means perfunctory.  The court asked the entire venire of jurors four separate questions about the effect on them of pretrial publicity or information about the case obtained by other means.  One juror admitted to having formed a belief as to petitioner's guilt and was excused for cause.  The trial court then conducted further *voir dire* in panels of four, and each time an individual juror indicated that he had acquired knowledge about the case from outside sources, he was asked whether he had formed an opinion; none of the jurors seated indicated that he had formed an opinion.  One juror who equivocated as to her impartiality was excused by the trial court on its own motion.

Mu'Min, 500 U.S. at 431.

In this case, the Appellate Division rejected Feng's publicity claim as follows:

> In State v. Bey . . . , 112 N.J. at 74-92, the [New Jersey Supreme] Court emphasized the need for determining whether jurors were exposed to prejudicial outside influences in the context of trial publicity . . . .  If . . . the Court determines that there is a realistic possibility that information with the capacity to prejudice defendant's right to a fair trial may have reached members of the jury, it should conduct a voir dire to determine whether any exposure has actually occurred . . .
>
> *                    *                    *
>
> To begin with, we are convinced that it is only defendants' police statements that might be prejudicial should the jurors have learned of them through the news articles . . . .  But reference to those statements was at the end of the article and located on a continued page.  Moreover, there is no indication in the caption of the article that such information might be found therein.  In addition, the statements were not per se inadmissible and would have been used by the State to impeach defendants had they testified . . . .
>
> Moreover, for most of the defendants, the statements were not incompatible with the general thrust of the defense.  The defense proffered at trial, generally, was that the State's evidence was suspect and that, if the jury were to conclude that they were at the scene, they were not involved in purposeful or knowing murders.  We recognize that the reported statements of Chao Lin Feng and Yun Lin might seem contradictory to their trial defense in that each seemed to argue at trial that

15

they were mistakenly identified as perpetrators, either as principle of accomplice, whereas their statements placed each at the scene.  However, the statements, even if learned of by the jurors, pale in comparison to the overwhelming evidence properly presented to the jury.  We cannot see how knowledge of them could have, therefore, been prejudicial.

In any event, we are satisfied the second step of the <u>Bey</u> analysis was not established.  Unlike the situation presented in <u>Bey</u> where the highly prejudicial information had been the subject of repeated coverage in the press (at least five newspaper articles), the complained-of material here was published only once.  It received no prominence.  Indeed, as we have said, the reported statements were located in the middle of the New Jersey section of the paper at the end of an otherwise innocuous article.  None of the objectionable material was even hinted at in the headline.  Hence, the extent, notoriety and prominence of the media coverage afforded this material militates against a finding that a repeated publicity-warned juror was exposed to it.

We also take note of the fact that his jury seems to have rather conscientiously weighed and analyzed the evidence.  The acquittals of the arson felon-murders, the kidnapping felony-murders of Liang Wang Guo, Yu Ping Zhang, Guang Sheng Li, and the possession of a defaced .25 caliber Raven Arms semi-automatic revolver, reflect that.

*     *     *

Therefore, while it might have been better had the trial judge acceded to the request to <u>voir dire</u> the jurors, we are convinced the failure to do so was not error requiring a reversal.

State v. Feng, Docket No. A-5065-95T4 slip op. at 27-33 (citations and internal quotation marks omitted).

Here, Feng argues in his Reply that the New Jersey courts' rejection of his publicity claim was contrary to, or an unreasonable application of <u>Sheppard v. Maxwell</u>, 384 U.S. 333 (1966).  <u>Sheppard</u> was a § 2254 case brought by Dr. Sam Sheppard who was indicted for murdering his wife and who faced the death penalty.  The Supreme Court ruled that the pretrial and trial publicity deprived Sheppard of a fair trial.  However, <u>Sheppard</u> is factually distinguishable, in

16

that Sheppard faced the death penalty; the judge merely requested or suggested that the jury refrain from reading, watching or listening to reports about the case; the judge allowed the newspapers to publish the names and addresses of jurors, who were bombarded with press and letters; three months before trial, a public inquest was televised, where Sheppard was examined for five hours without counsel and the inquest "ended in a public brawl," id. at 354; the trial began two weeks before a hotly contested election at which both the Chief Prosecutor and the judge were candidates for judgeships; "bedlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom," id. at 355, and a press table was set up inside the bar; "[p]articipants in the trial, including the jury, were forced to run a ga[u]ntlet of reporters and photographers each time they entered or left the courtroom," id.; and

> [m]uch of the material printed or broadcast during the trial was never heard from the witness stand, such as the charges that Sheppard had purposely impeded the murder investigation and must be guilty since he had hired a prominent criminal lawyer; that Sheppard was a perjurer; that he had sexual relations with numerous women; that his slain wife had characterized him as a "Jekyll-Hyde"; that he was "a barefaced liar" because of his testimony as to police treatment; and finally that a woman convict claimed Sheppard to be the father of her illegitimate child.  As the trial progressed, the newspapers summarized and interpreted the evidence, devoting particular attention to the material that incriminated Sheppard, and often drew unwarranted inferences from testimony.  At one point, a front-page picture of Mrs. Sheppard's blood-stained pillow was published after being 'doctored' to show more clearly an alleged imprint of a surgical instrument.

Id. at 356-57.

Sheppard, the case relied upon by Feng, is factually distinguishable.  This Court holds that the New Jersey courts' rejection of Feng's publicity claim is not contrary to, or an unreasonable application of Skilling, Sheppard, or other Supreme Court holdings, and Feng is not entitled to habeas relief on Ground Two.

17

B.  Sixth Amendment - Inadequate Voir Dire Generally (Ground One)

In Ground One, Feng contends that the *voir dire* was so inadequate in general that it violated his right to a fair and impartial jury under the Sixth and Fourteenth Amendments.  As factual support for Ground One, Feng states that many of the completed juror questionnaires (drafted by defense counsel and approved by the court) were not given to defense counsel for review prior to questioning by the judge, the questions the judge asked jurors on the record were cursory and leading, and the judge failed to follow up when questionable answers were provided on the questionnaires.  As factual support, Feng states:

> The trial court . . . ruled that the completed questionnaires were to be photocopied by the prosecutor's office and each defendant be given a copy to review prior to *voir dire*.  As a <u>starting point</u> the court would *voir dire* prospective jurors based on the answers contained in their questionnaires.  Defense counsels [were] also allowed to ask follow-up questions based on the answers in the questionnaires . . . .  Using this procedure, after two whole days of jury selection, only six (6) jurors were qualified.  Seeing this difficulty, the prosecutor complained to the court the jury selection was taking too long.  On the next day, when jury selection resumed, the court dramatically reduced the numbers of questions posed to the potential jurors.  The questions asked were leading in nature - making the correct answer unmistakably clear . . . .  It was also counsels' understanding that the questionnaires would be used only to <u>supplement the standard questions</u>.  The court characterized counsels' concerns as "nonsense."  The court then informed defense counsels that "Mr. Murray [the prosecutor] has advised that he doesn't wish to photocopy [the questionnaires] any longer.  What we're going to have to do I guess is just circulate them and see where it take[s] us.  The next group, we have them circulated, we'll take before lunch." . . . .
>
> [W]hen *voir dire* resumed . . . all questions contained in the questionnaire were not asked.  In that fifty (50) out of the sixty six (66) qualified jurors were asked only two to three pointed questions (including nine (9) sitting jurors).  In fact, the court spent **less than one minute** each on *voir dire* in selecting five of the sitting jurors . . . .
>
> [I]t was still very difficult for the court to qualify prospective jurors.  In that, after seven (7) days of jury selection, comprising over 500 prospective jurors, only 46 were qualified.  Given that there were 96 State and defense peremptory challenges, 33 out of the 46 qualified jurors were quickly struck.

18

Seeing this difficulty, the court again further expedited the selection process by delegating to the jury commissioner the authority of pre-qualifying potential jurors. The court also decided that he would unilaterally review the questionnaires, and if the court sees anything on the questionnaire the court will then let the attorneys review. Hence, the six defense attorneys are forced to review the questionnaire via circulation while the court is conducting the in-court *voir dire* of the jurors . . . [T]he court sought to qualify such jurors via leading questions . . . . [P]etitioner submits that the trial court qualification and selection of sitting jurors D.R., E.O. and A.R. violated petitioner's right to a fair and impartial jury.

Sitting juror D.R. indicated . . . that she could not decide the defendants' cases separately based solely on the evidence presented against each defendant . . . . D.R. also indicated . . . that she read the *Bergen Record* every day, and . . . that she ha[d] heard or read about the case prior to the trial . . . .

Sitting juror E.O. indicated in question 31 that she could not be fair and impartial and decide the case against petitioner based solely on the evidence presented because of some of the defendants' immigration status . . . .

Sitting juror A.R. indicated . . . that she needed to discuss questions #23 [participation in victims' rights or assistance group] and #31 with the court . . . .

A.R.: I don't think that it would affect my ability to decide the guilt or innocence, but I need to let you know that a brother of mine was murder[ed] in August of 1994 and they do have a suspect and he is an illegal alien, I do not know that much about the case because he was residing in California, the case will not go to trial for at least two years, and I don't want it to come up later.

The court then led the juror by not asking her, but telling her that the murder of her brother would not affect her ability to be fair . . . .

It is manifestly improper to not perform an in depth *voir dire* of a prospective juror whose brother was murdered by the very class of defendants on trial in the instant case. The failure to discharge sitting jurors D.R., E.O. and A.R. for cause, along with the court's qualification of obvious biased jurors resulted in Chao Lin Feng being denied a fair and impartial jury.

[Dkt. 1 at 15-23.]

Feng primarily raised this ground in his petition for post-conviction relief. The Law

Division rejected the claim as follows:

19

[Defendants raise] certain requests concerning jury selection.  In that regard, there is the jury questionnaire, a very extensive one prepared, and it was prepared through the cooperation of defense counsel, with the prosecutor participating, and with the Court to some extent.  Twelve pages with an attached list of witnesses and so forth.  And I know Mr. Zhu obtained an affidavit of Mr. Pieroni which raises, I think, questions of what he says is not quite accurate.  He says there was only one for all six defense attorneys, and I know that's not accurate, because Mr. Murray was providing the first until whatever reason he became upset with some argument of counsel, and I don't remember what it was now, he wasn't going to do it.  But thereafter, they were provided, sometimes a little slower than liked.

But Mr. Pieroni says there was only one copy, but he ends up with 800 pages of jury questionnaire[s], and that would mean that no one else had them but him, and that's not so.  Knowing Mr. McAlevy and Mr. Neary, they would not end up without their file, and I don't mean to say that Mr. Weichsel, Contaldi or Jerejian wouldn't.  It is clear they were being submitted, because Mr. Pieroni says there were fifteen pages . . . .  [T]he panel selection was not - we didn't fill a seat up at one time, we waited until we had a certain number and then proceeded to pick the jury.  Then the appellate court would have to understand this is not a normal se[le]ction where a panel comes in, put fourteen in the box, and find out if they could serve or not serve.  This was done by first finding out if they could spend the time, and then they filled out the questionnaire.  Of the 200 jurors who showed up, according to Mr. Pieroni, I would assume that at least half walked out on a fifty-two day trial with job, plans, employment.

In fact, I personally think the 200 who were never actually screened, it is more than 200, and, of course, while he complains, Mr. Pieroni, he says fifty pages of questionnaire.  It's not like reading a book.  We all know certain questions are very important, some are not.  You want to know where they work, where they live.  Then you want such items like what newspaper they read, what high school they went to, and the issue concerning law enforcement officers is covered in the questions.

As I said, prepared by the defendants, gone over by the Court, and now after the trial is over we're being told that three jurors should not be allowed to sit on the case.  The defendants had not run out of challenges.  As I said, you deal with between McAlevy, Weichsel, Jerejian, Neary, and - I shouldn't say McAlevy here, but McAlevy is a well known criminal defense attorney who is constantly trying murder cases all over New Jersey.  Neary is trying them in Bergen County, at least two a year, if not more.  Jerejian tries them.  John Weichsel tries them.  Contaldi has been involved with them.  Pieroni, who is a regular appearing in criminal trials in this courthouse, and they're all very active defense attorneys.

20

As I said, some of the premier ones, that there is a juror that shouldn't be there, is total nonsense, and that jurors were rehabilitated is - sometimes there are jurors you like, because they're making a promise to you that they will be fair and impartial.  They didn't check it off as a routine because they wanted to get on jury duty.  They're making the promise, and as I say, the trial lawyers relied upon that promise, more so than others.

There may be certain things that you like about that person, which doesn't show here.  The appearance to understand a respective juror.  How they talk.  You know, their voice means a lot.  People, when evaluating jurors, how they walk, do they slouch, do they stand up straight, do they stand up tall.  Are they leaders, because that's one of the questions that was asked.  Do they supervise people. The purpose of that is to find out people in charge of people.  Do they take care of people, leave and promoted.

I'd find beyond belief that six very active defense attorneys would allow someone like Miss Rakowski there, that they didn't think - or O'Brien, Reavis.  As I said, with regard to that one, the last death penalty case I tried, one of the jurors who stayed on had a father killed in a burglary - it really was not quite a burglary but taking a cash box by someone who even worked at the Sears, or leaving to go to another building on their property, and that was the one juror who voted for life over death.

So there are reasons for leaving them on when you're a defendant.  Again, you evaluate the entire person, not part of the answer.  I don't find that defendants - and it's my recollection, not that you can check it out, but I believe all defendants had a few challenges left - maybe not Mr. Pieroni, but most of the other defendants had challenges left.  So, it wasn't a question that this was forced down their throat.

[Dkt. 15-3 at 92-96.]

"*Voir dire* examination serves the dual purposes of enabling the court to select an impartial jury and assisting counsel in exercising peremptory challenges."  Mu'Min v. Virginia, 500 U.S. 415, 431 (1991).  "No hard-and-fast formula dictates the necessary depth or breadth of *voir dire*."  Skilling, 130 S.Ct. at 2917.  "The Constitution . . . does not dictate a catechism for *voir dire*, but only that the defendant be afforded an impartial jury.  Even so, part of the guarantee

of a defendant's right to an impartial jury is an adequate *voir dire* to identify unqualified jurors."

Morgan v. Illinois, 504 U.S. 719, 729 (1992).

In the federal prosecution of Jeffrey Skilling, the chief executive officer of Enron, the

Supreme Court rejected Skilling's claim that the *voir dire* was insufficient because jury selection

lasted only five hours, most of the court's questions were conclusory and failed to adequately

probe jurors true feelings, and the court consistently took prospective jurors at their word once

they claimed they could be fair.  See Skilling, 130 S.Ct. at 2918.  In that case, the district court

"initially screened venire members by eliciting their responses to a comprehensive questionnaire

drafted in large part by Skilling.  That survey helped to identify prospective jurors excusable for

cause and served as a springboard for further questions put to remaining members of the array."

Id. at 2919.  The Supreme Court held that Skilling failed to show that the five-hour *voir dire*

violated Skilling's constitutional right to an impartial jury:

> The District Court, moreover, did not simply take venire members who
> proclaimed their impartiality at their word . . . .  [A]ll of Skilling's jurors had
> already affirmed on their questionnaires that they would have no trouble basing a
> verdict only on the evidence at trial. Nevertheless, the court followed up with each
> individually to uncover concealed bias. This face-to-face opportunity to gauge
> demeanor and credibility, coupled with information from the questionnaires
> regarding jurors' backgrounds, opinions, and sources of news, gave the court a
> sturdy foundation to assess fitness for jury service . . . . The jury's not-guilty
> verdict on nine insider-trading counts after nearly five days of deliberation,
> meanwhile, suggests the court's assessments were accurate. Skilling, we conclude,
> failed to show that his *voir dire* fell short of constitutional requirements.

Skilling, 130 S.Ct. at 2922 -2923 (citations and footnotes omitted).

Here, "there were eight days of jury selection," State v. Zhu, 165 N.J. at 551,  as opposed

to five hours in Skilling.  In Feng's case, like Skilling's, the Law Division used a questionnaire

prepared by defense and the judge followed up with face-to-face questioning aimed at bias.  Also,

22

the fact that the jury found Feng not guilty of counts 10, 11, 12, 18, 19, 20, 21, and 36 suggests that the court's and defense counsels' assessments of juror fitness were accurate. At the very least, fair-minded jurists would disagree whether the *voir dire* was so inadequate that Feng was not able to identify unqualified jurors and, in that case, the standard under § 2254(d)(1) is not satisfied. See Harrington, 131 S.Ct. at 786; Morgan, 504 U.S. at 729.

Feng also singles out three jurors who, he claims, were actually biased. "In reviewing claims of this type, the deference due to [trial] courts is at its pinnacle: 'A trial court's findings of juror impartiality may be overturned only for manifest error.'" Skilling, 130 S.Ct. at 2923 (quoting Mu'Min, 500 U.S. at 428). In this case, as in Skilling, no defense counsel regarded these jurors as so biased as to warrant exercise of a peremptory challenge. Skilling, 130 S. Ct. at 2923 n.31 ("[U]se [of] a peremptory challenge to effect an instantaneous cure of [a trial judge's erroneous for-cause ruling] exemplifies a principal reason for peremptories: to help secure the constitutional guarantee of trial by an impartial jury") (citation and internal quotation marks omitted). Moreover, here, as in Skilling, the trial judge (and defense counsel) "had looked [each of these jurors] in the eye and . . . heard all [their answers and] found [their] assertions of impartiality credible." Id at 2924 (citations and internal quotation marks omitted). Under these circumstances, the New Jersey courts' adjudication of Feng's inadequate *voir dire* claim was not contrary to, or an unreasonable application of Skilling or other Supreme Court holdings.

C.  Due Process - Security Measures (Ground Three)

Feng argues in Ground Three that the security measures gave the jury the perception that he was guilty and thereby deprived him of a fair trial. As factual support, Feng argues:

The defendant's trial was marked by an unprecedented and pervasive presence of Bergen County Sheriff Officers and other police officers in the courtroom at all times, commencing with the first day of trial.  These officers were constantly standing by or near the defendants, as if on the look out for an attempted escape or commission of acts of violence by the defendants, who stood accused of several extremely violent acts.  In short, the courtroom too[k] on the appearance of a war zone or an armed camp.

On the first day, co-counsel made reference to the needless and extraordinary security procedures that were being employed, including the searching of counsel, the jurors and court personnel . . . .  [T]here were six Sheriff Officers, one for each defendant, and they were standing directly behind each defendant . . . .  [T]he attorneys and some potential jurors were directed by officers to proceed through the courtroom via a path which was not the most direct to the jury box . . . . [T]here was no reason to do this, except to raise the concern that jurors might fear for their safety . . . .  [T]he officers were not allowing defendants to bring their notes with them . . . .   Counsel requested a hearing on the entire [security] issue.

The court again refused to hold a hearing or make any inquiry into . . . any of the security/mistreatment issues that had been constantly raised during the trial.  Counsel then moved for a mistrial . . . .  The court . . . denied the motion for a mistrial, stating that these matters did not "go to the guilt or innocence of these defendants."

*   *   *

The trial court completely abdicated its crucial role of guarding the right of defendant to a fair trial for the sake of expediency and for, clearly, not wanting to bother itself with details of the court security which had undeniabl[y] begun to impinge on the sanctity of the judicial process.  The trial court repeatedly refused defense requests to hold a hearing on the security issue or to intervene in the security issues.  The end result was a "Kafkaesque" type of trial, one in which the pervasive "feeling" of guilt so overshadowed the defendant and overwhelmed the jury that there was absolutely no chance whatsoever of defendant receiving a fair trial.

[Dkt. 1 at 29-34.]

Feng raised this issue on direct appeal, and the New Jersey Supreme Court issued a

published opinion, holding that the heightened security measures did not deprive the defendants

24

of a fair trial or create an unacceptable atmosphere suggestive of guilt under the standard set forth

in Holbrook v. Flynn, 475 U.S. 560 (1986).  First, this Court notes that the New Jersey Supreme

Court found the following facts, which are entitled to the presumption of correctness[3]:

> On May 22, 1995, the trial court conducted a hearing during which defense
> counsel questioned Captain Benedetto regarding the proposed [security] plan . . . .
> Captain Benedetto explained that in addition to passing through metal detectors
> located at the main entrances to the courthouse, all individuals entering the
> courtroom would be cleared each day by security personnel employing
> magnetometers (handheld metal detectors that resemble wands) . . . .
> Additionally, Sheriff's officers positioned outside the courtroom would visually
> inspect any handbags, packages, or briefcases belonging to any person seeking
> entry.  Security personnel employing those procedures would clear all persons
> entering the courtroom, including jurors, counsel, judicial staff, spectators, and the
> judge himself.

> Captain Benedetto explained that the heightened security plan was necessary
> because:  first, the Sheriff's Office believed that an organized criminal group had
> threatened the lives of one or more defendants; second, there was a possibility that
> a family member of the judge, his staff, or the jurors might be held hostage and a
> family member of that hostage would be compelled to smuggle a weapon into the
> courtroom in exchange for the hostage's safety; and third, it might be possible for
> someone to bypass the security checkpoints at the two main entrances because of
> the large number of other entrances to the courthouse . . .

> At the conclusion of the hearing, the trial court announced its intention to enter an
> order essentially codifying the proposed procedures . . . .  On May 30, 1995, the
> trial court entered an order formally adopting the security plan . . . .  In its cover
> letter to all counsel enclosing that order, the court noted that any party objecting to
> the provisions of the order could petition the Appellate Division for review.  Two
> defendants sought leave to appeal from the order [and t]he Appellate Division
> denied that request.

---

[3] The Supreme Court has emphasized that "[f]actual determinations by state courts are
presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a
decision adjudicated on the merits in a state court and based on a factual determination will not
be overturned on factual grounds unless objectively unreasonable in light of the evidence
presented in the state-court proceeding, § 2254(d)(2)."  Miller-El v. Cockrell, 537 U.S. 322, 340
(2003).

The trial began on September 11, 1995, and ended on December 15, 1995 . . . .
As part of *voir dire*, every juror was asked the following question:

> The Bergen County Sheriff's Office has determined that increased security
> measures are necessary for this trial . . . .  Do you understand that the
> security measures have nothing to do with the guilt or innocence of each
> defendant and should not affect your verdict in any way . . . ?

No cautionary instruction was given to the jury during the trial or before
deliberations, and none was requested by defendants.

The Sheriff's Office implemented the security plan essentially as described in the
court's order . . . .  For our purposes we will assume that the number of uniformed
officers fluctuated between eighteen (the average of defendants' claims) and
eleven (the average of the State's claims), depending on the day.  The record is
clear that one officer stood directly behind each defendant throughout trial.

Zhu, 165 N.J. at 549-551.

After reviewing the Holbrook standard, the New Jersey Supreme Court:

conclude[d] that the security plan did not pose an unacceptable risk of unfairness.
Our reasons are similar to those noted by the Appellate Division:

> First, at no time was a finding made, or an accusation brought, that extra
> security measures were needed because of the conduct, character, or prior
> record of the defendants . . . .  That is, the extra security was needed
> purportedly to protect defendants, and everyone else involved in the trial,
> from threats from outside parties - not to protect anyone from the
> defendants . . . .  Second, all prospective jurors were asked in their
> questionnaires whether they understood that increased security measures,
> including the search of all persons entering the courtroom, had nothing to
> do with the guilt or innocence of defendants.  Third, the patent, and
> unacceptable, hostility displayed towards the defense attorneys was, for the
> most part, out of the presence of the jury, and not in the courtroom itself.

$$\ast \qquad\qquad \ast \qquad\qquad \ast$$

Common experience informs us that citizens have become accustomed to the
presence of security personnel in most public places, including schools . . . .  Such

26

common practices help prevent jurors from drawing any undue inferences at the sight of similar security measures in a courthouse setting . . . .

Nor do we conclude that the trial court impermissibly delegated its responsibilities to the Sheriff . . . .  Because the crimes alleged in the indictment were the product of a violent, intra-gang rivalry capable of reaching into the courtroom, we cannot fault the trial court for accepting Captain Benedetto's testimony, even though additional findings to enhance that testimony might have strengthened the basis for the court's action.

Accordingly, we hold that the heightened security measures in this case did not deprive defendants of a fair trial before an impartial jury.  Even if we assume some slight error on the part of the trial court in the manner in which the security plan was adopted and implemented, or by the court's failure to deliver an unsolicited cautionary charge to reinforce the *voir dire*, such error was not clearly capable of contributing to the verdict in view of the overwhelming evidence of defendants' guilt.

Zhu, 165 N.J. at 554-56.

In Estelle v. Williams, 425 U.S. 501 (1976), the Supreme Court stated that "the State cannot, consistently with the Fourteenth Amendment, compel an accused to stand trial before a jury while dressed in identifiable prison clothes, id. at 512, "but held that the defendant in that case had waived any objection to being tried in prison clothes by failing to object at trial."  Carey v. Musladin, 549 U.S. 70, 75 (2006).  In Holbrook v. Flynn, six co-defendants were being tried for robbing the Bonded Vault Co. at gunpoint, breaking into safe-deposit boxes in the vault and escaping with four million dollars in cash and valuables.  Throughout the course of the jury selection and trial, a uniformed and armed state trooper sat behind each defendant in the first spectator row.  Holbrook, 475 U.S. at 563 n.2 (citation omitted).  After pursuing the issue on direct appeal, Charles Flynn filed a § 2254 petition, which the district court denied.  The First Circuit reversed, finding as follows:  "[W]ith no threats shown to safety, [the trial judge]

27

balanced nothing, but simply indicated a fear that since the defendants had not been bailed, they

might flee from the courtroom.  There was no evidence even suggesting any unusual likelihood

of this; nor had anything whatever made 'manifest' the 'necessity for heightened security.'. . . .

Even if all jurors had indicated an unreserved opinion that the troopers' presence would not

affect them, such expression, on a case as extreme as this, where there was no need to rely on it,

is totally unacceptable."  Id. at 566-67.

> The Supreme Court reversed the court of appeals.  First, the Supreme Court noted:
>
>> Recognizing that jurors are quite aware that the defendant appearing before them
>> did not arrive there by choice or happenstance, we have never tried, and could
>> never hope, to eliminate from trial procedures every reminder that the State has
>> chosen to marshal its resources against a defendant to punish him for allegedly
>> criminal conduct.  To guarantee a defendant's due process rights under ordinary
>> circumstances, our legal system has instead placed primary reliance on the
>> adversary system and the presumption of innocence.  When defense counsel
>> vigorously represents his client's interests and the trial judge assiduously works to
>> impress jurors with the need to presume the defendant's innocence, we have
>> trusted that a fair result can be obtained.
>>
>> Our faith in the adversary system and in jurors' capacity to adhere to the trial
>> judge's instructions has never been absolute, however.  We have recognized that
>> certain practices pose such a threat to the fairness of the factfinding process that
>> they must be subjected to close judicial scrutiny . . . .

Holbrook, 475 U.S. at 567-68 (citations and internal quotation marks omitted).

Second, the Holbrook Court held that the conspicuous deployment of armed security

personnel during trial is not the sort of "inherently prejudicial practice that, like shackling, should

be permitted only where justified by an essential state interest specific to each trial."  Holbrook,

475 U.S. at 568-69.  Accordingly, "the question must be not whether jurors actually articulated a

consciousness of some prejudicial effect, but rather whether an unacceptable risk is presented of

impermissible factors coming into play." Id. at 570 (citation and internal quotation marks omitted).

Third, the Court further held that "we simply cannot find an unacceptable risk of prejudice in the spectacle of four [armed state troopers] quietly sitting in the first row of a courtroom's spectator section." Id. at 571. "We note, moreover, that even were we able to discern a slight degree of prejudice attributable to the troopers' presence at respondent's trial, sufficient cause for this level of security could be found in the State's need to maintain custody over defendants who had been denied bail after an individualized determination that their presence at trial could not otherwise be ensured. Unlike a policy requiring detained defendants to wear prison garb, the deployment of troopers was intimately related to the State's legitimate interest in maintaining custody during the proceedings and thus did not offend the Equal Protection Clause by arbitrarily discriminating against those unable to post bail or to whom bail had been denied." Id. at 571-72.[4]

Fourth, the Holbrook Court clarified the limited nature of review of such a claim in a habeas petition under § 2254:

> [O]ur task here is not to determine whether it might have been feasible for the State to have employed less conspicuous security measures in the courtroom. While, in our supervisory capacity, we might express a preference that officers providing courtroom security in federal courts not be easily identifiable by jurors as guards, we are much more constrained when reviewing a constitutional challenge to a state-court proceeding. All a federal court may do in such a

---

[4] See also Deck v. Missouri, 544 U.S. 622, 529 (2005) ("[T]he Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial"); Illinois v. Allen, 397 U.S. 337, 344 (1970) (Supreme Court conceded that in extreme situations shackling and gagging of defendant may be "the fairest and most reasonable way to handle" a particularly disruptive defendant).

situation is look at the scene presented to jurors and determine whether what they
saw was so inherently prejudicial as to pose an unacceptable threat to defendant's
right to a fair trial; if the challenged practice is not found inherently prejudicial
and if the defendant fails to show actual prejudice, the inquiry is over.

Holbrook, 475 U.S. at 572 (footnote omitted).

Here, Feng has not shown that the challenged security measures were inherently

prejudicial or caused actual prejudice.  See Holbrook, 475 U.S. at 572.  Accordingly, this Court

finds that the New Jersey Supreme Court's rejection of his Sixth and Fourteenth Amendment

claim that heightened security measures violated his right to a fair trial was not contrary to, or an

unreasonable application of Holbrook or other Supreme Court holdings.  See Sutton v. Bell, 645

F. 3d 752, 756 (6th Cir. 2011) (holding that increased security consisting of four guards behind

defense table, one next to jury, two in balcony, and one at each of courtroom's three doors in trial

of three inmates for violently murdering an inmate was not unconstitutional under Holbrook).

Habeas relief is not warranted on Ground Three.

D.  Due Process - Failure to Dismiss Burglary Count (Ground Four)

In Ground Four, Feng contends that the "failure to dismiss the burglary count of the

indictment violated petitioner's right to due process."  [Dkt. 1 at 35.]  As factual support, he

states that the trial judge's failure to dismiss the burglary count before submitting it to the jury

was improper because the state presented no evidence showing that Feng was in the house or that

he shared the same purpose with regard to anyone in the house.  This Court construes this ground

as a sufficiency of the evidence claim.

A sufficiency of the evidence claim is governed by Jackson v. Virginia, 443 U.S. 307,

318 (1979).  "[I]n a challenge to a state criminal conviction brought under 28 U.S.C. § 2254 - if

30

the settled procedural prerequisites for such a claim have otherwise been satisfied - the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Id. at 324; accord McDaniel v. Brown, 130 S. Ct. 665, 666 (2010) (per curiam).  When assessing a sufficiency of the evidence claim in a § 2254 petition, the sufficiency of the evidence standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." Jackson, 443 U.S. at 324 n.16.  Jackson "requires a reviewing court to review the evidence in the light most favorable to the prosecution.  Expressed more fully, this means a reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" McDaniel, 130 S. Ct. at 673 (quoting Jackson, 443 U.S. at 326); see also House v. Bell, 547 U.S. 518, 538 (2006) ("When confronted with a challenge based on trial evidence, courts presume the jury resolved evidentiary disputes reasonably so long as sufficient evidence supports the verdict").  The Court emphasized that "the standard . . . does not permit a court to make its own subjective determination of guilt or innocence." Jackson at 320, n. 13.  Moreover, "a reviewing court must consider all of the evidence admitted by the trial court, regardless whether that evidence was admitted erroneously." McDaniel, 130 S. Ct. at 672 (citation and internal quotation marks omitted).  Moreover, "under Jackson, the assessment of credibility of witnesses is generally beyond the scope of review." Schlup v. Delo, 513 U.S. 298, 330 (1995).  The question is "whether, viewing the evidence in the light most favorable to the state, it was objectively unreasonable for the Appellate Division to conclude that a rational trier of fact could

31

have found, beyond a reasonable doubt that [petitioner] was guilty[.]" <u>Kamienski v. Hendricks</u>, 2009 WL 1477235 (3d Cir. May 28, 2009).

In this case, the insufficiency of the evidence as to burglary was raised on direct appeal. <u>See</u> <u>State v. Feng</u>, Docket No. A-5065-95T4 slip op. at 4.  The Appellate Division rejected the claim without discussion, merely commenting, "We are also satisfied that the convictions were based upon overwhelming evidence of defendants' guilt." <u>Id.</u> at 6.  This Court notes that the alien - Lin Ling Chang, who was tied in the basement, shot in the head and survived to testify - "identified . . . Chao Lin Feng . . . as among those who committed the murders and who attempted to murder him." <u>Id.</u> at 7.  Accordingly, this Court finds that the New Jersey courts' rejection of Feng's sufficiency of the evidence claim with respect to burglary was not contrary to, or an unreasonable application of <u>Jackson</u> and its progeny.  Petitioner is not entitled to habeas relief on Ground Four.

## E.  Due Process - Prosecutorial Misconduct (Ground Five)

In Ground Five, Feng argues that the prosecutor's use of perjured testimony and suppression of a police report violated due process.

### (1) Use of Perjured Testimony

As factual support for his claim that the prosecutor used perjured testimony, Feng states that the prosecutor knew that the testimony of gang member Ming Cheng was false because Detective Danyo's application for a search warrant stated that Ming Cheng had told Sgt. Trahey that three of the gang members he picked up in New York and transported to the house in Teaneck brought guns.  [Dkt. 1 at 39-40.]  Feng contends that "Ming Cheng's . . . statement [as recounted in Detective Danyo's application for a search warrant] defeats the prosecutor's case-in-

32

chief and would have completely changed the way the jury would have contemplated the culpability of the defendant.  The jury never heard evidence that the victims were heavily armed with various handguns and actually initiated the violence."  [Dkt. 1 at 40.]

In addition, Feng claims that the prosecutor presented false testimony from Mr. Tu and Mr. Tam when these witnesses testified that the federal government had not promised any sentence reduction in exchange for their testimony against Feng.  Feng states:

> Tam and Tu both testified on behalf of the State and were pending sentence on a federal indictment [in the Southern District of New York.]  In fact, Tam and Tu agreed to cooperate with the government, expected and did receive a substantial benefit[].  The prosecutors elicited testimony that the State promised Tam and Tu nothing in return for their cooperation.  He elicited that the federal prosecutors told Tam and Tu that they could cooperate and testify in criminal trials, but that nothing concrete was promised and that any agreements could be voided by the federal prosecutors.  The prosecutors['] insistence of no promises of leniency in the jury's presence were simply not true.

> Both Tam and Tu ultimately received substantially reduced sentences because of the substantial assistance that they gave to the government in testifying at petitioner's trial.  At the time they pled guilty, Tam and Tu w[ere]  facing a life sentence in prison.  However, Tam served merely four years in prison.  Tu served only a six year custodial term.

[Dkt. 1 at 40-41.]

Feng raised this issue in part on direct appeal.  In its opinion, the Appellate Division found that the state presented

> testimony from four Fuk Ching gang members, one of whom was a victim and another who was present at the scene.  The testimony of these witnesses was, to an extent, effectively impeached by defense counsel.  But the State's case also included other inculpatory evidence obtained from the crime scene, the vehicles used and a Brooklyn apartment where the crimes were planned.  The evidence included impartial witness accounts and physical evidence directly connecting defendants to the crimes.

State v. Feng, Docket No. A-5065-95T4 slip op. at 7.

Feng also raised this issue in his petition for post-conviction relief (after Tu and Tam had been sentenced in federal court).  The Law Division Judge rejected the claim as follows:

One issue raised by a number of - presumably by all but not argued by all, concerning Mr. Tam and Mr. Tu, who testified with regard thereto, and this issue was really raised at the Appellate Division [on direct appeal] on page seven.  The State's evidence included testimony from four Fuk Ching gang members and one of whom was a victim, another who was present at the scene.  The testimony of these witnesses of which I include Tam and Tu, although not mentioned [by name], was to the extent effectively impeached by defendants' counsel.

So, I mean, certainly this issue was raised by the Appellate Division, discussed as to the impact of Mr. Tam an[d] Mr. Tu, and I think at the time Mr. Tam, Mr. Tu had not resolved all of their cases, were testifying in other proceedings in other courts not in New Jersey, not related - may be related to this but not part of this matter.  So, certainly with regard to that, the fact that someone faces twenty-five years to life, perhaps, and then they receive less, is well examined and explored by defense counsel, and as I recall, Mr. Tam and Mr. Tu were never treated with too much respect by defense counsel, and because they wanted to make sure it was shown that they were making a deal and that that's really why they were testifying.

[Dkt. 15-3 at 83-84.]

On appeal from the order denying post-conviction relief, the Appellate Division described the testimony of Mr. Tam and Mr. Tu as follows:

Alan Tam, one of the main witnesses against defendants, was a member of the Fuk Ching.  He pled guilty in federal court to charges related to the killings and agreed to testify at this trial.  Alan Tam testified that in early April 1993, he spent several days at an apartment in Brooklyn where Simon Lau, Chao Lin Feng, and Jeffrey Zhu attempted to recruit him to participate in the murder of Ah Wong.  The motivation behind this plot was to gain control of the alien smuggling business and to strike back for the attempted killing of Xin Dan Lin.  Alan Tam met with Ah Wong four days before the killing.  He did not warn Ah Wong of the murder plot against him.

> Tu Wei Chung was also a member of the Fuk Ching gang.  Like Tam, he testified
> for the State pursuant to a plea agreement on federal charges.  He corroborated
> Tam's testimony.

State v. Lin, 2010 WL 1330272 at *2.

In Napue v. People of State of Ill., 360 U.S. 264 (1959), the Supreme Court held that due process is violated when "false testimony used by the State in securing the conviction . . . may have had an effect on the outcome of the trial."  Id. at 272.  "The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend."  United States v. Bagley, 473 U.S. 667, 676 (1985) (quoting Napue, 360 U.S. at 269)).  However, "[a] finding of materiality of the evidence is required . . . .  A new trial is required if the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . ."  Giglio v. United States, 405 U.S. 150,  154 (1972) (citations and internal quotation marks omitted).  Thus, in United States v. Bagley, 473 U.S. 667, 677 (1985), the Supreme Court "noted the well-established rule that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."  Id. at 677  (citations and internal quotation marks omitted); accord Smith v. Phillips, 455 U.S. 209, 219 n.10 (1982) ("Even in cases of egregious prosecutorial misconduct, such as the knowing use of perjured testimony, we have required a new trial only when the tainted evidence was material to the case").

Here, there was no due process violation based on the use of perjured testimony or any unreasonable application of Supreme Court holdings.  First, given the physical evidence linking

Feng to the crimes and the impartial testimony of the alien Lin Ling Chang who identified Feng, the allegedly false testimony of Ming Cheng was not material to Feng's guilt or the fairness of his trial.  Second, Feng has not shown that Mr. Tam and Mr. Tu testified falsely when they testified that there was no promise of leniency made to them in exchange for their testimony. Third, given that defense counsel impeached Tam and Tu, in part, because they had each made deals, the allegedly false testimony of Tam and Tu that they received no promise of leniency, was not material to Feng's guilt or the fairness of his trial.  Accordingly, Feng is not entitled to habeas relief on his use of perjured testimony claims.  See Prosdocimo v. Secretary, Pa. Dept. of Correc., 2012 WL 120102 (3d Cir. Jan. 17, 2012); Lambert v. Blackwell, 387 F. 3d 210, 242 (3d Cir. 2004).

(2) Failure to Disclose Evidence

Feng also contends that "the prosecution improperly withheld and/or altered discovery in violation of [his] right[s] under Brady v. Maryland."  [Dkt. 1 at 41.]  As factual support, Feng states:

> During the cross examination of Detective Cox, in an almost inadvertent manner, the fact that he had prepared two separate and supposedly "original" police reports was revealed.  In one of the reports, the Detective stated that a bullet was found on the person of Xan Dan Lin; in the other "Original" report, he stated that this same bullet was found on the person of another co-defendant.  Cox supplied both report[s] to the prosecutor, who only turned over the initial original report to defense counsel.

> The defendant was completely surprised and the omitted discovery pertained to a crucial issue in the whole proceeding.

> The prosecutor's explanation for this failure to provide discovery was, simply, ignorance.  He claimed that he took the report from a file and did not know that there were two reports and that they differed in this crucial aspect.  The court,

36

seemingly jumping to the prosecutor's defense, stated that . . . although the officer's manner of handling reports may not have been "the best way" to do so . . . that (in the court's view) was "the problem of word processors."

Moreover, it was later discovered that there were two different signatures on the different reports.  This fact was pointed out by co-counsel, but met with indifference by the trial court which intimated that this was a matter for cross-examination.  In opposition  to that remark, another co-counsel argued that if the officer was lying under oath, that was an extraordinarily serious matter, one that demanded more from the court than an acknowledgment that cross-examination could resolve the inconsistency.  The court stood by its denial of the mistrial motion and refused to inquire further into the matter.

[Dkt. 1 at 41-42.]

Feng raised this claim on direct appeal, arguing that "the defendant was not given a different copy of a police report it [h]ad already received.  The defense could not properly cross-examine on this important issue since it came out during trial.  The judge [ruled] there was no violation concerning the changed police report and he was not going to do anything about it." [Dkt. 14-1 at 67.]  The Appellate Division rejected the claim without discussion.  See State v. Feng, Docket No. A-5065-95T4 slip op. at 4 & 6 ("We are satisfied that defendants received as fair a trial as they could, under the circumstances.  We are also satisfied that the convictions were based upon overwhelming evidence of defendants' guilt.  While, therefore, there may have been some trial errors, none of them are such as to require reversal.  We have carefully examined all of the numerous contentions raised by counsel and pro se defendants in light of the entire record and applicable law and are convinced all but three issues require no further opinion.").

The Supreme Court has held that the prosecution in a criminal proceeding has a due process obligation to disclose to the defendant its knowledge of material evidence favorable to the defendant, either because the evidence is exculpatory or because it can serve to impeach a key

prosecution witness.  See Kyles v. Whitley, 514 U.S. 419, 433 (1995); Giglio v. United States, 405 U.S. 150 (1972); Brady v. Maryland, 373 U.S. 83 (1967).  Supreme Court precedent clarifies that "[t]here are three components of a true Brady violation:  The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  Strickler v. Greene, 527 U.S. 263, 281-82 (1999).  "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."  United States v. Bagley, 473 U.S. 667, 682 (1985); see also California v. Trombetta, 467 U.S. 479, 488-89 (1984) (state's failure to retain breath samples was not unconstitutional where the chances are extremely low that preserved samples would have been exculpatory).

In this case, this Court has examined Feng's brief on direct appeal, as well as his § 2254 Petition, and Feng has not shown (or even argued) that, had the second police report (in which Cox stated that a particular bullet was found on the person of a co-defendant other than Xan Dan Lin) been disclosed in discovery, the outcome of the proceeding would have been different.  And since the Appellate Division's rejection of the claim on the ground that the alleged non-disclosure did not undermine confidence in the outcome of the proceeding, the Appellate Division's adjudication of the claim was not contrary to, or an unreasonable application of Supreme Court holdings.

F.  Sixth Amendment - Ineffective Assistance of Counsel (Grounds Six and Seven)

In Grounds Six and Seven, Feng argues that counsel was constitutionally ineffective.  In Ground Six, he argues that counsel "failed to exercise Petitioner's six remaining peremptory challenges to strike jurors Donna Rakowski, Elaine O'Brian and Alma Reavis which resulted in biased jurors on Petitioner's jury."  [Dkt. 1 at 44.]  In Ground Seven, he argues that counsel failed to introduce the exculpatory statement in Detective Danyo's affidavit for a search warrant regarding possession of guns by the victims, failed to object to prosecutor's erroneous statements, and failed to interview and adequately impeach the testimony of Allan Tam and Henry Tu.  Finally, Feng argues that the conduct of Sheriff's Officers with respect to counsel and defendants, and the preclusion of side bar conferences, unconstitutionally interfered with his right to the effective assistance of counsel.

The Sixth Amendment, applicable to states through the Due Process Clause of the Fourteenth Amendment, guarantees the accused the "right . . . to have the Assistance of Counsel for his defense."  U.S. Const. amend. VI.  The right to counsel is the right to the effective assistance of counsel, and counsel can deprive a defendant of the right by failing to render adequate legal assistance.  See Strickland v. Washington, 466 U.S. 668, 686 (1984).

A claim that counsel's assistance was so defective as to require reversal of a conviction has two components, both of which must be satisfied.  See Strickland, 466 U.S. at 687.  First, the defendant must "show that counsel's representation fell below an objective standard of reasonableness."  Id. at 687-88.  To meet this prong, a "convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."  Id. at 690.  The court must then determine

39

whether, in light of all the circumstances at the time, the identified errors were so serious that they were outside the wide range of professionally competent assistance.  Id.  In analyzing alleged deficient performance, a court "begin[s] with the premise that 'under the circumstances, the challenged action[s] might be considered sound trial strategy,'"  Cullen, 131 S.Ct. at 1404 (quoting Strickland at 689).  A court "'must indulge [the] strong presumption' that counsel 'made all significant decisions in the exercise of reasonable professional judgment.'"  Cullen, 131 S.Ct. at 1407 (quoting Strickland at 689-90).

To satisfy the prejudice prong, the defendant must show that "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Id. at 695.  As the Supreme Court explained,

> In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

Strickland, 466 U.S. at 695-696.

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct *so undermined* the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Cullen, 131 S. Ct. at 1403 (quoting Strickland, 466

U.S. at 686 (emphasis in <u>Cullen</u>).  Habeas review of a state court's adjudication of an ineffective assistance claim is "doubly deferential."  <u>Knowles v. Mirzayance</u>, 556 U.S. ___, ___, 129 S.Ct. 1411, 1413 (2009).  To obtain habeas relief, a state petitioner "must demonstrate that it was necessarily unreasonable for the [state c]ourt to conclude:  (1) that [petitioner] had not overcome the strong presumption of competence; and (2) that he failed to undermine confidence in the [outcome]."  <u>Cullen</u>, 131 S.Ct. at 1403.

Feng presented his ineffective assistance of counsel claims in his petition for post-conviction relief.  The Law Division rejected the claims, primarily because defendants did not show prejudice, and the Appellate Division affirmed on this basis:

> At the outset, we note that the State had a strong case.  There were two eyewitnesses to the massacre:  Lin Ling Chan and Ming Cheng.  They were both familiar with all defendants.  Identity was not an issue.  In addition, Alan Tam and [Tu] Wai Chung, who had prior knowledge of the conspiracy, testified for the State.  Against this background, defense counsel had little proof of arguments to counter the evidence against defendants.  From our careful review of the record, we note that counsel vigorously participated in the trial, cross-examining witnesses and making arguments on behalf of their clients.  Moreover, there was ample evidence of defendants' guilt.

>        \*              \*              \*

> It is well-settled that when arguing that counsel failed to conduct a pre-trial investigation or interview witnesses a defendant must do more than make bald assertions of denial of the effective assistance of counsel.  When a defendant alleges that his or her attorney inadequately investigated the case, the defendant must assert facts that an investigation would have revealed, supported by affidavits or certifications based upon the personal knowledge of the affiant or the person making the certification . . . .

> Here, [defendant] has not presented an affidavit or certification to support his assertions . . .

              *               *               *

In sum, following the Strickland/Fritz standard, our review of the record does not disclose any deficiency by any of the trial, appellate, or PCR counsels.  Further, there is overwhelming evidence that defendants committed the crimes of which they were convicted.  Moreover, even if we assumed that, in some respects, defense counsel's representation of any of the defendants was deficient, defendants failed to establish the defendants would have been found not guilty of the charges [i]f their attorneys had handled the matter differently.

State v. Lin, 2010 WL 1330272 *4, *5, *10 (N.J. Super. Ct., App. Div., Apr. 6, 2010) (citations and internal quotation marks omitted).

Given the overwhelming evidence of guilt, this Court finds that the New Jersey courts' rejection of Petitioner's ineffective assistance claims for failure to show prejudice was not contrary to, or an unreasonable application of Strickland and its progeny.[5]  See DeLozier v. Sirmons, 531 F. 3d 1306, 1323 (10th cir. 2008) ("Generally, an attorney's actions during voir dire are considered to be matters of trial strategy, which cannot be the basis of an ineffective assistance claim unless counsel's decision is so ill chosen that it permeates the entire trial with obvious unfairness"); Gardner v. Ozmint, 511 F. 3d 420, 425-26 (4th Cir. 2007) (noting that "[o]n habeas review, federal courts generally accord particular deference to the judgment of trial counsel during voir dire, state court's determination that counsel's failure to use a peremptory challenge on allegedly biased juror was tactical did not warrant habeas relief) (citation omitted). Thus, Petitioner is not entitled to habeas relief on his ineffective assistance of counsel claims.

---

[5] The Supreme Court instructs that a court need not address both components of an ineffective assistance claim "if the defendant makes an insufficient showing on one."  Strickland, 466 U.S. at 697.  "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."  Id.

G.  Certificate of Appealability

The Court denies a certificate of appealability because Petitioner has not made "a substantial showing of the denial of a constitutional right" under 28 U.S.C. § 2253(c)(2).  See Miller-El v. Cockrell, 537 U.S. 322 (2003).

## V.  CONCLUSION

Based on the foregoing, the Court dismisses the Petition and denies a certificate of appealability.

**S/ SUSAN D. WIGENTON, U.S.D.J.**

DATED: February 15, 2012